# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| ELIZABETH MORRISON, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12808-VCG |
| | ) | |
| RAY BERRY, RICHARD A. ANICETTI, MICHAEL D. CASEY, JEFFREY NAYLOR, RICHARD NOLL, BOB SASSER, ROBERT K. SHEARER, MICHAEL TUCCI, STEVEN TANGER, JANE THOMPSON, BRETT BERRY, SCOTT DUGGAN, CRAVATH, SWAINE & MOORE LLP, JPMORGAN CHASE & CO., J.P. MORGAN SECURITIES, LLC, POMEGRANATE HOLDINGS, INC., APOLLO INVESTMENT FUND VIII, L.P., APOLLO OVERSEAS PARTNERS (DELAWARE 892) VIII, L.P., APOLLO OVERSEAS PARTNERS (DELAWARE) VIII, L.P., APOLLO OVERSEAS PARTNERS VIII, L.P., APOLLO ADVISORS VIII, L.P., APOLLO MANAGEMENT VIII, L.P., AIF VIII MANAGEMENT, LLC, APOLLO MANAGEMENT, L.P., APOLLO MANAGEMENT GP, LLC, APOLLO MANAGEMENT HOLDINGS, L.P., APOLLO MANAGEMENT HOLDINGS GP, LLC, APO CORP, AP PROFESSIONAL HOLDINGS, L.P., and APOLLO GLOBAL MANAGEMENT, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OPINION

Date Submitted: February 24, 2020
Date Decided: June 1, 2020

Joel Friedlander, Jeffrey M. Gorris, Christopher P. Quinn, and Bradley P. Lehman, of FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; OF COUNSEL: Randall J. Baron and Christopher H. Lyons, of ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California, *Attorneys for Plaintiff.*

Rudolf Koch, Matthew D. Perri, and John M. O'Toole, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Adam L. Sisitsky, Lavinia M. Weizel, Robert I. Bodian, and Scott A. Rader of MINTZ, LEVIN, COHN FERRIS, GLOVSKY AND POPEO, P.C. New York, New York and Boston, Massachusetts, *Attorneys for Independent Director Defendants.*

William B. Chandler III, Bradley D. Sorrels, Lindsay K. Faccenda, and Daniyal M. Iqbal, of WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware, *Attorneys for Scott Duggan, Defendant.*

Patricia L. Enerio, Jamie L. Brown, and Gillian L. Andrews, of HEYMAN ENERIO GATTUSO & HIRZELL LLP, Wilmington, Delaware, *Attorneys for Richard A. Anicetti, Defendant.*

Kevin G. Abrams, J. Peter Shindel, Jr., and Matthew L. Miller, of ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: Matthew A. Schwartz and Joshua S. Levy of SULLIVAN & CROMWELL LLP, New York, New York, *Attorneys for JPMorgan Chase & Co. and J.P. Morgan Securities, LLC, Defendants.*

William M. Lafferty, S. Mark Hurd, Thomas W. Briggs, Jr., and Elizabeth A. Mullin, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Stuart W. Gold, Richard W. Clary, of CRAVATH, SWAINE & MOORE LLP, New York, New York, *Attorneys for Cravath, Swaine & Moore, LLP, Defendant.*

Kevin R. Shannon and Matthew F. Davis, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Jonathan Rosenberg and Abby F. Rudzin of O'MELVENY & MYERS LLP, New York, New York, *Attorneys for Apollo Defendants.*

John L. Reed and Peter H. Kyle, of DLA PIPER LLP, Wilmington, Delaware; OF COUNSEL: David Clarke, Jr., of DLA PIPER LLP, Washington, D.C., *Attorneys for Berry Defendants.*

GLASSCOCK, Vice Chancellor

This is the current installment of this long-running litigation concerning the merger/takeover of grocery store chain The Fresh Market, Inc. ("Fresh Market" or the "Company") by the Apollo group of equity investors. The rather complex history of this litigation, as well as the fiduciary duty claims in connection with it that have survived a motion to dismiss under Rule 12(b)(6), are laid out in some depth in a prior Memorandum Opinion in this matter, which issued on December, 31, 2019. What follows below is my resolution of motions to dismiss by the numerous Defendants charged with aiding and abetting liability with respect to those claims. The circumstances with respect to each entity so charged are unique, and thus the results of the motions to dismiss are mixed. My reasoning follows.

## I. BACKGROUND

I draw all facts from the Plaintiff's Verified Second Amended Complaint (the "SAC") and documents incorporated therein.[1] A full factual recitation is available in the Memorandum Opinion issued on December 31, 2019.[2] That Opinion resolved the motions to dismiss from those Defendants with fiduciary duties: The Director Defendants (defined below), Ray Berry, Scott Duggan, and Richard Anicetti. This Opinion resolves the motions to dismiss from those Defendants facing aiding and

---

[1] Verified Sec. Am. Compl., Docket Item ("D.I.") 169 ("SAC"). As discussed further below, all well-pled facts are considered true for the sake of this motion.

[2] *Morrison v. Berry*, 2019 WL 7369431 (Del. Ch. Dec. 31, 2019).

1

abetting claims: Brett Berry, Apollo, J.P. Morgan, and Cravath, as defined below. This Opinion recites the facts necessary to resolve these remaining motions to dismiss.

### A. The Parties and Relevant Non-Parties

Non-party Fresh Market is a Delaware corporation headquartered in North Carolina that operates as a specialty grocery retailer.[3]

Plaintiff Elizabeth Morrison was, at all relevant times, a stockholder of Fresh Market.[4]

Defendant Ray Berry was Fresh Market's Chairman of the Board and former CEO.[5] Defendant Brett Berry, Ray Berry's son, was a former CEO and Vice Chairman of the Board.[6] Prior to the transaction, Ray and Brett Berry together owned approximately 9.8% of Fresh Market's shares, and approximately 22% of Fresh Market equity after the deal closed.[7] Ray Berry's son-in-law, Michael Barry, owned approximately 6% of Fresh Market stock prior to the transaction.[8]

---

[3] SAC, ¶ 25.

[4] *Id.* ¶ 24.

[5] *Id.* ¶ 26.

[6] *Id.* ¶ 27. Brett Berry was not a director, officer, or employee of Fresh Market during any period relevant to this litigation. *See Id.*

[7] *Id.* ¶ 2.

[8] *Id.*

2

Michael Casey, Jeffrey Naylor, Richard Noll, Bob Sasser, Robert Shearer, Steven Tanger, Jane Thompson, and Michael Tucci (collectively, with Richard Anicetti, the "Directors") were members of the Fresh Market board of directors (the "Board").[9]

Defendant Scott Duggan was Fresh Market's Chief Legal Officer and Senior Vice president – General Counsel.[10]

Defendant Richard Anicetti, in addition to being a director on the Board, was Fresh Market's President and CEO.[11]

Defendant Cravath, Swaine & Moore LLP ("Cravath") is a New York limited liability partnership that served as Fresh Market's legal counsel for the transaction.[12]

Defendant JPMorgan Chase & Co., is a Delaware corporation and parent to Defendant J.P. Morgan Securities, LLC, a Delaware limited liability company.[13] J.P. Morgan Securities, LLC served as Fresh Market's financial advisor in the transaction.[14] I refer to both Defendants collectively as "J.P. Morgan."

---

[9] *Id.* ¶ 28. I granted the Director Defendants' Motion to Dismiss on December 31, 2019.

[10] *Id.* ¶ 29.

[11] *Id.* ¶ 28.

[12] *Id.* ¶ 30.

[13] *Id.* ¶¶ 30–31.

[14] *Id.* ¶ 31.

A constellation of fifteen entities comprise the Apollo Defendants, all of which I refer to collectively as "Apollo." Pomegranate Holdings, Inc. is a Delaware corporation and parent company of Pomegranate Merger Sub, Inc., the company that merged with and into Fresh Market in the transaction.[15] Pomegranate Holdings, Inc. is controlled by private-equity funds managed by Apollo Management VIII, L.P. ("Apollo Management VIII").[16] Four separate Apollo investment funds contributed to the acquisition and retained an equity stake in Fresh Market following the transaction: Apollo Investment Fund VIII, L.P., Apollo Overseas Partners (Delaware 892) VIII, L.P., Apollo Overseas Partners (Delaware) VIII, L.P., and Apollo Overseas Partners VIII, L.P.[17] The first three are Delaware limited partnerships, the last a Cayman Islands limited partnership.[18] All the investment funds are managed by Apollo Management VIII.[19] AIF VIII Management, LLC, a Delaware limited liability company, is the general partner of Apollo Management VIII.[20] In turn, Apollo Management, L.P., a Delaware limited partnership, is the sole member and manager of AIF VIII Management, LLC.[21] Apollo Advisors VIII, L.P., a Delaware

---

[15] *Id.* ¶ 33.

[16] *Id.*

[17] *Id.* ¶¶ 34–37.

[18] *Id.*

[19] *Id.* ¶ 3

[20] *Id.* ¶ 41.

[21] *Id.* ¶ 42.

limited partnership, serves as general partner of each of the investment funds.[22] Apollo Management GP, LLC, a Delaware limited liability company, is the general partner of Apollo Management, L.P.[23] Apollo Management Holdings, L.P., a Delaware limited partnership, is the sole member and manager of Apollo Management GP, LLC.[24] Apollo Management Holdings, GP, LLC, a Delaware limited liability company, is the general partner of Apollo Management Holdings, L.P.[25] APO Corp., a Delaware corporation, is the intermediate holding company through which Apollo Global Management, LLC holds its interests in various other Apollo entities.[26] AP Professional Holdings, L.P., a Cayman Islands exempted limited partnership, allows managing partners at Apollo to indirectly beneficially own a majority interest in each Apollo entity.[27]

---

[22] *Id.* ¶ 39.

[23] *Id.* ¶ 43.

[24] *Id.* ¶ 44.

[25] *Id.* ¶ 45.

[26] *Id.* ¶ 46.

[27] *Id.* ¶ 47.

*B. Factual Background*

1. <u>Fresh Market Faces Stock Woes, and Ray Berry Makes an Agreement with Apollo</u>

After Fresh Market's CEO departed in January 2015, the Company's stock declined over the course of eight months, reducing by more than half.[28]  In this atmosphere, Apollo's Andrew Jhawar reached out to Ray Berry in July 2015 to discuss taking Fresh Market private.[29]  In an email to colleagues, Jhawar described how he "pounced" on the opportunity to discuss a going-private transaction with Berry, "given valuation and the apparent lack of love from Wall Street and the analyst community."[30]  Berry and Jhawar exchanged several messages and agreed to speak in September to discuss the potential transaction.[31]  Berry did not disclose Apollo's inquiries to either the interim-CEO or the lead director.[32]

The Board hired a new CEO, Richard Anicetti, on September 1, 2015.[33]  On September 4, Ray Berry contacted Jhawar to put him in touch with his son, Brett Berry, so they could discuss an equity rollover of the Berrys' stock.[34]  Jhawar and

---

[28] *Id.* ¶¶ 50–51, 53.

[29] *Id.* ¶¶ 55–56.

[30] *Id.* ¶ 56.

[31] *Id.* ¶¶ 58–60.

[32] *Id.* ¶¶ 61–62.

[33] *Id.* ¶¶ 65–66.

[34] *Id.* ¶¶ 68–69.

Brett Berry then communicated about potential transaction structures.[35]  Ray Berry wrote to Jhawar that he had talked with both Brett Berry and his son-in-law Mike Barry and that after contacting an attorney, "one of [them]" would contact Jhawar after they were certain of their position.[36]

Ray Berry kept Apollo's interest under wraps.[37]  On September 24, Brett Berry sent Jhawar and Ray Berry a theoretical deal summary.[38]  The next day, Ray and Brett Berry discussed the potential transaction with Apollo; as proposed, the transaction would increase the Berry family's ownership from approximately 9.4% pre-deal to 28.3% post-deal.[39]  Both Ray and Brett Berry orally agreed with Apollo to roll over their equity in the event of a successful Apollo acquisition.[40]

### 2. Ray Berry Discloses Apollo's Interest

On September 25, 2015, Ray Berry told Duggan about Apollo's acquisition proposal.[41]  On September 28, when Duggan had not responded, Berry instructed Jhawar to contact Duggan directly, which Jhawar did.[42]  On October 1, Apollo

---

[35] *Id.* ¶ 68.

[36] *Id.* ¶ 69.

[37] *Id.* ¶ 74.

[38] *Id.* ¶ 75.

[39] *Id.* ¶¶ 75–76.

[40] *Id.* ¶ 76.

[41] *Id.* ¶ 77.

[42] *Id.* ¶ 78.

submitted its proposal to acquire Fresh Market at $30 per share.[43]  The acquisition's proposed capital structure, which included an equity rollover with the Berrys, stated, "Apollo and the Berrys will be working together in an exclusive partnership as it relates to a transaction with The Fresh Market."[44]

The Board called a special meeting on October 15 to discuss a response to Apollo's offer.[45]  Cravath was represented at the meeting by Damien Zoubek, as Fresh Market's counsel.[46]  In advance of the meeting, Berry downplayed to Duggan his involvement with Apollo.[47]  Berry told Duggan that he had no involvement formulating Apollo's proposal, had no commitment to or agreement with Apollo, that he was not working with Apollo on an exclusive basis, and that he was unaware of any contact between Apollo and Brett Berry.[48]  Neither the Board nor Cravath inquired further.[49]  At the meeting, Cravath counsel Zoubek asked Berry if he would be willing to participate in an equity rollover with an acquirer other than Apollo.[50] Berry maintained he had not committed to a transaction with Apollo, but he told the

---

[43] *Id.* ¶ 80.

[44] *Id.*

[45] *Id.* ¶ 83.

[46] *See id.* ¶¶ 87–88.

[47] *Id.* ¶¶ 83–84.

[48] *Id.* ¶ 86.

[49] *Id.* ¶ 87.

[50] *Id.* ¶ 88.

Board that "he was not aware of any other potential private equity buyer that had experience in the food retail industry with whom he would be comfortable engaging in an equity rollover."[51]

The day of the board meeting, Apollo sent a follow-up letter regarding its "proposal (together with Ray and Brett Berry) to acquire" Fresh Market.[52] The letter stated that "Apollo (together with the Berry family rollover) is able and willing to provide 100% of the equity commitment required in this potential transaction."[53] The letter set a deadline of October 20 for a response to the offer.[54] Brett Berry wrote to Jhawar, "your letter hits the spot."[55] There was a news leak the next day, and *Reuters* reported that Berry was searching for a private equity partner to make an offer for Fresh Market, and *Bloomberg* reported that Berry was working with Apollo to explore a buyout.[56]

### 3. The Board Puts the Company in Play

The Board decided to publicly announce the commencement of a review of strategic and financial alternatives.[57] On October 20, lead director Noll wrote to

---

[51] *Id.*

[52] *Id.* ¶ 92.

[53] *Id.*

[54] *Id.*

[55] *Id.* ¶ 93.

[56] *Id.* ¶ 94.

[57] *Id.* ¶ 98.

Apollo, "In your letter, you state that Apollo will be working together with the Berrys on an exclusive basis with respect to a potential transaction. We have confirmed with Ray Berry that he has no such arrangement with Apollo."[58] On October 21, Apollo withdrew its bid but continued to engage in discussion with the Berrys regarding a potential acquisition.[59] In its withdrawal notice, Apollo once again noted the Berrys' involvement, stating that it was withdrawing "Apollo's proposal (together with Ray and Brett Berry)."[60] Other communications around this time—not shared with the Board—demonstrated Apollo's ongoing relationship with the Berrys, including sharing and soliciting comments on draft financial models.[61]

Over a month later, on November 25, in a letter to J.P. Morgan addressed to the Board, Apollo formally renewed its acquisition offer "together with Ray and Brett Berry" for $30 per share.[62] That same day, Cravath spoke to Ray Berry's Counsel, who promised to "provide Cravath with a precise statement about Ray Berry's involvement with, and his views about, Apollo's offer."[63] On November 28, prompted by Cravath's inquiries, Ray Berry's counsel sent an email to Cravath

---

[58] *Id.* ¶ 100.

[59] *Id.* ¶ 101.

[60] *Id.*

[61] *Id.* ¶¶ 99, 101.

[62] *Id.* ¶ 102.

[63] *Id.* ¶ 103.

detailing his history and relationship with Apollo (the "November Email").[64]  The November Email acknowledged that Berry had an oral agreement with Apollo to roll over his shares if its bid was successful.[65]  The email confirmed his willingness to entertain another partner but reiterated his belief that Apollo was "uniquely qualified."[66]  Finally, the email cautioned that Berry would consider divesting his shares in the absence of a sale.[67]

The Board met on December 1–2.[68]  It granted the special committee (the "Committee") expanded authority to design a sales process.[69]  Also at these meetings, J.P. Morgan provided a discounted cash flow ("DCF") analysis based on management's projections that generated a range of values from $34.50 to $44.00 per share.[70]  After these meetings, Ray Berry confirmed, through Cravath's request on behalf of Fresh Market, (1) a willingness to discuss an equity rollover with a successful bidder other than Apollo and (2) an agreement not to discuss an equity rollover with any party until authorized to do so by Fresh Market.[71]

---

[64] *Id.* ¶ 104.  "Duggan read the November 28 Email in its entirety to the Board."  *Id.* ¶ 110.

[65] *Id.* ¶¶ 103–104.

[66] *Id.*

[67] *Id.*

[68] *Id.* ¶ 110.

[69] *Id.*

[70] *Id.* ¶ 112.

[71] *Id.* ¶ 114.

Apollo signed a confidentiality agreement on December 9, agreeing not to "initiate or maintain contact" with any director at Fresh Market without the Company's express permission.[72] On January 5, 2016, however, Jhawar wrote a purported New Year's greeting to Berry: "Hopefully, 2016 will be an exciting year for all of us to do something together."[73] Berry responded on January 8: "We are anticipating the possibility of an exciting 2016 with us participating together on a mutually rewarding project."[74] In addition to the New Year's greeting emails, an email from Jhawar's assistant reminded him to call Brett Berry, and so additional contact between Apollo and the Berry family may have transpired.[75]

### 4. The Board Conducts a Sale of the Company

#### a. The Board Institutes a Bidding Process

Over the course of the sales process, J.P. Morgan contacted thirty-two potential bidders, twenty of whom signed confidentiality agreements and received due diligence on Fresh Market, and the Committee met nineteen times.[76] Fresh Market represented to prospective bidders that Ray Berry was open to discussing a

---

[72] *Id.* ¶¶ 119–20. Jhawar's call lists and email records suggest he may have violated the agreement by communicating with the Berrys around this time. *See id.* ¶¶ 118, 120.

[73] *Id.* ¶ 122.

[74] *Id.*

[75] *Id.* ¶ 124.

[76] Transmittal Aff. of Matthew D. Perri in Support of the Independent Directors' Opening Br. in Support of their Mot. to Dismiss the Verified Sec. Am. Compl., D.I. 181–84 ("Perri Aff."), Ex. D, Schedule 14D-9 ("14D-9"), at 21–22.

potential rollover when authorized to engage by the Company.[77]  Meanwhile, internal documents from Apollo at this time show that it considered itself partnered exclusively with the Berrys in the bid for Fresh Market.[78]

During the bid process, Apollo's "client executive" at J.P. Morgan, Christian Oberle, fed inside information on the bid process to Apollo, even though he was not on the Fresh Market transaction team.[79]  Earlier, on December 3, 2016, after Apollo received the confidentiality agreement from J.P. Morgan, along with contact information for individuals in J.P. Morgan's M&A Group, Jhawar sent the information to Oberle and they set up a call.[80]  Oberle conveyed messages from Apollo to the J.P. Morgan team working on the Fresh Market transaction and advocated for Apollo, meanwhile providing Apollo with insights in return.[81]  For example, when Jhawar told Oberle to "keep pushing the M&A team on this for me" on January 6, Oberle responded that he would "do a bit more digging with the sellside team to see whether there is any flexibility around their current process and timeline."[82]  Oberle communicated messages from Jhawar to J.P. Morgan's senior

---

[77] SAC, ¶ 124.

[78] *Id.* ¶ 128 (Apollo was "[p]artnered exclusively with the founders"; "We are partnered together with . . . the Berry Family . . . who would roll $140 million of equity"; "we have maintained a strong relationship with the Berry family, who will roll over 4.5mm shares into the transaction").

[79] *See id.* ¶¶ 130–36.

[80] *Id.* ¶ 133.

[81] *See id.* ¶¶ 138–46.

[82] *Id.* ¶ 134.

M&A advisor.[83]  It also appears that Jhawar directly contacted J.P. Morgan's senior M&A advisor: he set up a call with Oberle to give him "the download of my conversation with [J.P. Morgan's M&A advisor] Anu."[84]  This inside information, according to the SAC, gave Apollo a distinct advantage, including being able to submit its bid earlier than other parties.[85]  The SAC does not allege that the Board, Duggan, Anicetti, or Berry knew about these communications.

On January 25, several parties submitted indications of interest.[86]  Apollo's was at $31.25 per share.[87]  After the indications of interest, Oberle championed Apollo behind the scenes at J.P. Morgan and communicated back to Jhawar regarding the process.[88]  J.P. Morgan gave a presentation to the Committee on February 25 and noted that Apollo continued to be motivated about the transaction, while other suitors' interests waned.[89]  Oberle communicated to Apollo that J.P. Morgan might be able to "fast-track[] [Apollo] via providing [it] a contract before others."[90]  Ultimately, Fresh Market accelerated the process for Apollo and permitted

---

[83] *Id.* ¶ 135.

[84] *See id.* ¶ 136.

[85] *Id.* ¶ 146.

[86] *Id.* ¶ 137.

[87] *Id.*

[88] *Id.* ¶ 141.

[89] *Id.* ¶ 142.

[90] *Id.* ¶ 143.

14

it to submit a bid on March 8, ahead of the March 14 date communicated to other bidders.[91]  Apollo submitted a definitive proposal of $27.25 per share, four dollars less than its indication of interest.[92]  Its bid was not contingent upon an equity rollover with the Berrys.[93]  No other suitor submitted a definitive bid.[94]

Before the Board made a decision, J.P. Morgan provided the Board with an updated conflicts disclosure that discussed its business relationship with Apollo and represented that the "senior deal team members" assigned to the Fresh Market sale were not "currently providing services" to Apollo and were not "member[s] of the coverage team" for Apollo.[95]  The conflict memorandum did not disclose Oberle's communications with both the Fresh Market team and Apollo's Jhawar.[96]  Following the deal's close, Oberle and Jhawar would exchange congratulations by email.[97]

### b. The Committee Requests Additional Financial Projections

From December 2015 through the end of the sales process in March 2016, the Board reviewed several different financial projections.  Originally, in December 2015, management provided the Board with a three-year financial model (the

---

[91] *Id.* ¶¶ 146–47.

[92] *Id.* ¶ 147.

[93] *Id.* ¶ 179.

[94] *Id.* ¶ 147.

[95] *Id.* ¶ 149.

[96] *Id.*

[97] *Id.* ¶ 150–51.

"Management Projections").[98]  The Management Projections included a "15% overall risk adjustment . . . based on likelihood of achievability."[99]  The Board, although it perceived execution risks regarding these projections, approved management's 2016 operating plan and asked for stretch targets to motivate management performance.[100]  Approaching the sale, the Committee requested "additional scenario analyses . . . in light of the Corporation's recent business performance and the risks relating to the Corporation's ability to execute on its strategic plan, as well as the trends facing the specialty food retail industry as a whole" from J.P. Morgan.[101]  The Committee purportedly based this decision on "feedback that the Corporation has received throughout the [sale] process from potential bidders that there was a high degree of perceived execution risk inherent in the Corporation's strategic plan."[102]  The SAC alleges, however, that "JP Morgan

---

[98] *Id.* ¶ 153.  According to the SAC, it appears management had provided J.P. Morgan with "downward revised projections" in November, then, after it presented the Management Projections to the Board on December 1–2, it asked J.P. Morgan to "disregard the downward revised projection provided to you on November 18." *Id.*

[99] *Id.* ¶ 185.

[100] *Id.* ¶¶ 154–57; Perri Aff., Ex. L, Minutes of the Board of Directors Meeting dated December 1–2, 2015, at 18 (Board identifying execution risks in Management Projections); 14D-9, at 20 (same).

[101] *Id.* ¶ 162.

[102] *Id.*

gathered recurring positive bidder feedback" and that any hesitancy was based on other factors.[103]

That same day, CFO Ackerman advised J.P. Morgan that management "do[es] not have an updated" long run strategic plan and "still plan[s] to execute against the previously submitted" Management Projections.[104] The next day, management contacted J.P. Morgan to have a "sensitivity discussion."[105] On March 3, the Committee met to request that management and J.P. Morgan "refine [sensitivities on the Management Projections] . . . and develop additional financial projection scenarios so that the Board would have that perspective when it met to determine how to respond to any bids that were received."[106] On March 6, Committee member Naylor asked Duggan when J.P. Morgan would complete the sensitivities, and Duggan said they would be done "after a proposal is put forward."[107] Ultimately, management decided to postpone and review what J.P. Morgan developed.[108]

On March 7—the day before Apollo's bid submission—J.P. Morgan created draft sensitivities for unit growth, gross margin, and revenue in response to the

---

[103] *Id.* ¶ 164.

[104] *Id.* ¶ 166.

[105] *Id.* ¶ 167.

[106] *Id.* ¶ 168.

[107] *Id.* ¶ 170.

[108] *Id.* ¶ 171.

Committee's request.[109]    The unit growth scenario was an upside case that contemplated faster growth than the Management Projections.[110]    J.P. Morgan submitted these sensitivities to management on March 8, the day of Apollo's bid.[111] Later that day, in the afternoon, J.P. Morgan sent revised sensitivities that excluded the upside unit growth scenario.[112]    In addition, it requested confirmation that "sensitivities to the company projections are prepared by, or at the direction of, and are approved by the management of [Fresh Market]."[113]    Raj Vennam, a Fresh Market finance executive, confirmed twenty-five minutes later.[114]

On the evening of March 8, J.P. Morgan submitted an additional scenario that suggested lower values by combining the comparable growth and gross margin scenarios.[115]  J.P. Morgan revised and resubmitted the projection scenarios again that same evening.[116]  Management confirmed within an hour of receipt.[117]  The SAC charts the results of J.P. Morgan's revisions over March 7 and 8: On March 7, the

---

[109] *Id.* ¶ 172.  The SAC alleges the sensitivities were reviewed internally and adjusted downward prior to submission to Fresh Market.  *Id.*

[110] *Id.* ¶ 173.

[111] *Id.*

[112] *Id.* ¶ 174.

[113] *Id.*

[114] *Id.*

[115] *Id.* ¶ 175–77.

[116] *Id.*

[117] *Id.* ¶ 176.

three initial scenarios provided a range of share value spanning from $27.24 to $40.12 per share; by the final version on the evening of March 8, the range was $20.89 to $32.73 per share.[118]   The March 8 Committee minutes stated, "Management confirmed that it was preparing more fulsome forecast sensitivities for J.P. Morgan to use in its valuation analyses."[119]

### c. The Board Negotiates and Finalizes the Merger

On March 8, 2016, the Committee determined that Apollo's bid was insufficient.[120]  In response, on March 9, Apollo submitted a "best and final" offer of $28.50 per share, an increase of $1.25 per share over its previous offer.[121]  At this point, the Committee decided to allow Apollo to engage in "chaperoned" discussions with the Berry family, although the price remained confidential.[122]  Berry wrote to Jhawar and Brett Berry on March 9: "It is exciting that [The Fresh Market] has decided to proceed with Apollo.  It will be great to hear the full story once we are cleared to talk.  I am looking forward to working with you both to help [Fresh Market] develop into a viable high growth and profitable retailer.  Thanks for all the work you and the Apollo people did over the past several months . . ."[123]

---

[118] *Id.* ¶ 177.

[119] *Id.* ¶ 178.

[120] *Id.* ¶ 179.

[121] *Id.* ¶ 180.

[122] *Id.*

[123] *Id.* ¶ 181.

On March 10, the Committee recommended to the Board that it accept Apollo's offer for $28.50 per share.[124] At that board meeting, Anicetti and Ackerman described the Management Projections as "an optimistic scenario if every element of the plan went according to estimates," and "more of an optimistic case at this point," which justified the lower financial scenarios.[125] Preliminary results for first quarter 2016 showed that comparable store sales were in line with the Management Projections, but new store sales had slightly underperformed.[126]

Also at the March 10 meeting, J.P. Morgan presented valuation analysis on the Management Projections as well as three downside scenarios.[127] Its downward revisions were based on (1) an increase in the discount rate, (2) an increase in the equity risk premium, and (3) a decrease in the terminal year EBITDA.[128] Communications at J.P. Morgan regarding the draft scenarios reveal some internal

---

[124] *Id.* ¶ 182.

[125] *Id.* ¶ 185. As noted above, the Management Projections included a 15% risk adjustment. *Id.*

[126] *Id.*

[127] *Id.* ¶ 186. The downside scenarios were (1) underperforming sales, (2) worse-than-anticipated margins, and (3) worse-than-anticipates sales and margins. *Id.*

[128] *Id.* ¶¶ 187–88. Specifically, J.P. Morgan increased its discount rate from an initial 8.5%-9.5% range to 9.0%-10.0%. *Id.* ¶ 187. It based this upward revision on a change in the betas of specialty retailers. *Id.* The higher impact change, however, came from the equity risk premium, which it increased 75 basis points, from a range of 6.0%-7.0% to 6.75%-7.75%. *Id.* This increase was in contrast to the supply-side equity risk premium, which decreased from 6.21% for 2015 to 6.03% for 2016. *Id.* As a result, the terminal year EBITDA multiple reduced from prior estimations of seven-to-nine times down to less than five. *Id.* ¶ 188.

skepticism.[129]   Absent the downward revisions, J.P. Morgan's DCF analysis of Management Projections—including the increased discount rate and low implied EBITDA multiple—implied a valuation range of $33.75 to $42.25 per share.[130]

The Board met again on March 11 and approved the merger at $28.50 per share.[131]   Fresh Market announced the acquisition, including the Berrys' equity rollover, on March 14.[132]   *Bloomberg* published an article that day noting the advantages the Berrys and Apollo each provided for the other and speculating that these advantaged led to an "edge" for Apollo in the acquisition.[133]

### 5. Fresh Market Files its 14D-9

On March 25, Fresh Market publicly filed its Schedule 14D-9 (the "14D-9"), and Apollo publicly filed its Schedule TO.[134]   Duggan drafted the 14D-9 with Cravath, and the Director Defendants approved.[135]   The 14D-9 omitted several facts that I found to be conceivably material.  In addition, the SAC alleges the Schedule TO contains material omissions because it does not disclose Apollo's initial call to

---

[129] *See id.* ¶ 189.  J.P. Morgan Managing Director Ben Wallace reviewed drafts of the DCF analysis and opined that the beta range for the discount rate "isn't justified" and that the terminal multiples "all seem low" based on the trading range.  *Id.*

[130] *Id.* ¶ 190.

[131] *Id.* ¶ 191.

[132] *Id.* ¶ 195.

[133] *Id.* ¶ 196.

[134] *Id.* ¶ 198.  The 14D-9 incorporated the schedule TO by reference.  *Id.* ¶ 199.

[135] *Id.* ¶ 199.

Berry, Berry's oral agreement, or the "New Year's" greetings between Berry and Apollo.[136]

*C. Procedural History*

The Plaintiff filed her original Complaint on October 6, 2016 for breach of fiduciary duty against the Director Defendants, Ray Berry, and Anicetti, and aiding and abetting against Brett Berry.[137] I granted the Defendants' motions to dismiss on September 28, 2017.[138] The Supreme Court reversed and remanded the dismissal.[139] The Plaintiff added claims for aiding and abetting against J.P. Morgan, Apollo, and Cravath.[140] All Defendants moved to dismiss on July 12.[141] On December 31, 2019, I dismissed the Director Defendants, granted in part and denied in part the motions to dismiss for Duggan and Anicetti, and denied Ray Berry's Motion to Dismiss. I reserved decision on the motions to dismiss from J.P. Morgan, Apollo, Cravath, and Brett Berry. The relevant parties provided supplemental briefing, which concluded on February 24, 2020, at which time I considered the remaining motions fully submitted for decision.

---

[136] *Id.* ¶¶ 205, 209–10.

[137] Compl., D.I. 1.

[138] *Morrison v. Berry*, 2017 WL 4317252 (Del. Ch. Sept. 28, 2017), *rev'd*, 191 A.3d 268 (Del. 2018).

[139] *Morrison v. Berry*, 191 A.3d 268, 275 (Del. 2018).

[140] Verified Am. Compl., D.I. 88.

[141] D.I. 187–96.

## II. ANALYSIS

All Defendants have moved to dismiss this action under Chancery Court Rule 12(b)(6).[142]  In considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[143]

However, I do not need to accept "conclusory allegations unsupported by specific fact" as true, nor must I "draw unreasonable inferences" in the Plaintiff's favor.[144] Additionally, if allegations or documents "incorporated into the complaint effectively negate the claim as a matter of law," then I may dismiss the claim.[145]

The Defendants here—J.P. Morgan, Cravath, Apollo, and Brett Berry—all face claims for aiding and abetting a breach of fiduciary duty.  "A party is liable for aiding and abetting when it knowingly participates in any fiduciary breach."[146] "Knowing participation" in that breach "requires that the third party act with the

---

[142] Defendant Brett Berry has also moved to dismiss for lack of personal jurisdiction under Chancery Court Rule 12(b)(2), discussed separately below.

[143] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotations omitted).

[144] *Thermopylae Capital Partners, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *9 (Del. Ch. Jan. 29, 2016) (quoting *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011)).

[145] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[146] *Chester Cty. Employees' Ret. Fund v. KCG Holdings, Inc.*, 2019 WL 2564093, at *18 (Del. Ch. June 21, 2019).

knowledge that the conduct advocated or assisted constitutes such a breach."[147] Therefore, "[i]f the third party knows that the board is breaching its duty ... and participates in the breach by misleading the board or creating the informational vacuum, then the third party can be liable for aiding and abetting."[148]

In evaluating a typical aiding and abetting claim, the legal analysis is simple enough: Has the predicate tort occurred? If yes, has the third party, with the requisite scienter, aided in the commission of the tort?[149] A twist occurs where the litigation is an attempt by former stockholders to hold a third party liable for self-serving actions that enabled an unfair merger process. The quintessential example is the conflicted financial advisor who conceals the conflict from the board of directors of the advisor's client, the target of the merger. Any direct claim for fraud or breach of contract belongs to the corporation and passes to the acquirer.[150] That entity has, presumably, little interest in pursuit of such a claim, and may in fact have benefited from or participated in the wrong. The former stockholders, who have suffered the

---

[147] *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 861–62 (Del. 2015) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2011) (citations omitted)).

[148] *Chester Cty.*, 2019 WL 2564093, at *18 (quoting *Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *13 (Del. Ch. Aug. 29, 2018)).

[149] *See Bay Center Apartments, LLC v. Emery PKI, LLC*, 2009 WL 1124451, at *13 (Del. Ch. Apr. 20, 2009) (denying motion to dismiss aiding and abetting fraud claim); *Anderson v. Airco, Inc.*, 2004 WL 1551484, at *8 (Del. Super. June 30, 2004) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . ." (quoting Restatement (Second) of Torts, § 876(b))).

[150] *See* 8 *Del. C.* § 259(a).

24

loss incurred from the unfair transaction, are without standing to assert the claim, directly, of the entity in which they held stock. They may, however, bring a claim for aiding-and-abetting a breach of fiduciary duty. But such a claim is problematic; the underlying tort to which such a claim would be tied is, logically, the breach of duty of the directors.[151] This is problematic because, in fact, the target directors are themselves typically the duped parties. Consider a case where a target board's ineffective actions in fact-checking the advisor fail to amount to, at a minimum, "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[152] In such a situation, the target directors' actions do not, on their own, amount to either disloyalty or gross negligence, so that the directors have *not* breached duties of care or loyalty.[153] Without an underlying tort, can the faithless advisor be held liable for aiding-and-abetting? If not, this risks a wrong without a remedy.

---

[151] *In re Comverge, Inc.*, 2014 WL 6686570, at *19 (Del. Ch. Nov. 25, 2014) (remarking on the need to show "evidence of an abuse of trust by the third-party aiders-and-abettors vis-à-vis the corporate fiduciaries" to prevail on an aiding and abetting claim).

[152] *Zimmerman v. Crothall*, 2012 WL 707238, at *8 (Del. Ch. Mar. 5, 2012) (quoting *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) and citing *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749–50 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)).

[153] One could imagine the aforementioned target's board of directors phoning their conflicted financial advisor daily inquiring if the advisor has any conflicts, yet the target board still fails to uncover the conflict because the advisor has created an "informational vacuum." *See RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015).

Our Supreme Court cut away at this Gordian knot in *RBC Capital Markets, LLC v. Jervis*.[154] In that case, the Court found, liability attached if the advisor, with the requisite scienter, caused the board to act in a way that made the transaction process itself unreasonable, under the situational reasonableness standard announced in *Revlon*[155] and its progeny.[156] In other words, where a conflicted advisor has prevented the board from conducting a reasonable sales process, in violation of the standard imposed on the board under *Revlon*, the advisor can be liable for aiding and abetting that breach without reference to the culpability of the individual directors. Consistent with this standard, "[t]he advisor is not absolved from liability simply because its clients' actions were taken in good-faith reliance on misleading and incomplete advice tainted by the advisor's own knowing disloyalty."[157] The pleading standard a plaintiff must achieve is nonetheless a high one; a plaintiff must

---

[154] 129 A.3d 816 (Del. 2015).

[155] *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986).

[156] *RBC Capital Mkts.*, 129 A.3d at 849–50; *see In re Rural Metro Corp.*, 88 A.3d 54, 83 (Del. Ch. 2014), *aff'd sub nom. RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015) ("To satisfy the enhanced scrutiny test in the M & A context, the defendant directors must establish both (i) the reasonableness of 'the decisionmaking process employed by the directors, including the information on which the directors based their decision,' and (ii) 'the reasonableness of the directors' action in light of the circumstances then existing.'" (quoting *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994))).

[157] *Singh v. Attenborough*, 137 A.3d 151, 153 (Del. 2016).

plead facts making it reasonably conceivable that the alleged aider-and-abettor acted with scienter.[158]

I apply this standard to the aiding-and abetting claims here.

*A. J.P. Morgan's Motion to Dismiss is Denied*

J.P. Morgan has moved to dismiss the Plaintiff's aiding and abetting claim under Chancery Court Rule 12(b)(6) for failure to state a claim. In the December 31, 2019 Opinion, I dismissed the Plaintiff's claim for a breach of the duty of loyalty against the Board. Because a 102(b)(7) clause exculpated the Board from violations of the duty of care, I did not consider whether the Directors had breached their duties in this regard. As explained above, however, that fact does not insulate aiders-and-abettors from liability. Where a financial advisor like J.P. Morgan has knowingly misled the board in a way that has caused the board to fail to comply with its *Revlon* duties, the advisor may be liable for aiding-and-abetting breaches of those duties.[159] In her supplemental briefing, the Plaintiff argues that the Board failed to ensure that the transaction complied with *Revlon*, and that J.P. Morgan aided and abetted that

---

[158] *Id.* at 152–53.

[159] *See RBC Capital Mkts.*, 129 A.3d at 861–63.

27

failure.[160]  Further, the Plaintiff asserts that J.P. Morgan aided in creating misleading disclosures.[161]

As an initial matter, therefore, it is necessary to resolve whether the Plaintiff adequately pleads that the Board failed to ensure that the transaction complied with *Revlon*.  The Plaintiff alleges that "Apollo is a major client of JP Morgan," having paid J.P. Morgan over $116 million in fees in the two years preceding the Fresh Market sale, and thus that J.P. Morgan was "incentivized to facilitate a sale to Apollo."[162]  Prior to closing, J.P. Morgan provided the Board with an updated conflicts disclosure memorandum regarding its relationship with Apollo.  That memorandum stated that the "senior deal team members" working for Fresh Market were not "currently providing services" for "member[s] of the coverage team" for Apollo.[163]  The Board did not probe further to ask whether any of the Apollo coverage team were acting as go-between for Apollo and the Fresh Market deal team.  The Plaintiff alleges that "JP Morgan's conflict memo gave the false impression to the Board that the Apollo coverage team was distinct from the Fresh

---

[160] Pl.'s Supplemental Br. in Opp'n to Mots. to Dismiss, D.I. 269 ("Pl.'s Supplemental Br."), at 1–9.

[161] *Id.* at 7–8.

[162] SAC, ¶ 8; *see also id.* ¶¶ 117 ("a sale process would serve the interest of Apollo, a 'premium' relationship for JP Morgan and a powerful repeat player in M&A."), 130 ("Apollo was a 'premium' relationship for JP Morgan and it was a 'priority within [JP Morgan] to strengthen the relationship.'").

[163] *Id.* ¶ 149.

Market M&A team, when, in fact, JP Morgan and Apollo were using Oberle as a conflicted backchannel and intermediary."[164] The Plaintiff supports this allegation with detailed factual pleadings about Oberle's role as a point of contact to channel confidential information to Apollo that arguably gave Apollo an edge in the bid process.[165]

In the December 31, 2019 Opinion, I dismissed the allegation that the Board's acceptance of J.P. Morgan's conflicts memorandum was an intentional or bad-faith dereliction of duty, i.e., that it violated the duty of loyalty for the directors.[166] I withheld ruling on its implications for the aiding and abetting claim. At this pleading stage, I find it reasonable to accept the Plaintiff's inference that although not bad faith, the Board's failure to comprehend its financial advisor's conflict of interest with the sole bidder conceivably breached duties imposed in the *Revlon* context.

In order to state a claim, the Plaintiff must also plead facts from which I can infer that J.P. Morgan aided and abetted such a breach. According to the SAC, J.P. Morgan permitted Apollo—the lead bidder—substantial contact with J.P. Morgan's Fresh Market M&A team both directly and by using its client executive as intermediary which, I may infer, influenced the bid process in Apollo's favor. A

---

[164] *Id.*

[165] *Id.* ¶¶ 130–46.

[166] *Morrison v. Berry*, 2019 WL 7369431, at *16 (Del. Ch. Dec. 31, 2019).

conflicts disclosure memorandum that fails to mention these substantive back-channel communications is, as the Plaintiff puts it, "artfully drafted."[167]  From this, I can infer that J.P. Morgan intentionally disguised its communications with Apollo and thus knowingly deceived the Board about its ongoing conflicts.  If so, it acted with the requisite scienter to support liability. At this stage, it is also reasonable to infer that if Apollo actually gained insight and favorable treatment, it may have used this to its advantage, depriving the Plaintiff of value in the transaction and supporting damages.

In addition, I find it reasonably conceivable that J.P. Morgan aided the breach of disclosure violations that, as pled, constituted breaches of the duty of care.  As noted in *RBC Capital Markets*, an advisor's "failure to fully disclose its conflicts and ulterior motives to the Board, in turn, led to a lack of disclosure in the Proxy Statement."[168]  Had J.P. Morgan disclosed its interactions with Apollo, the Board would have had that information reasonably available, and it is plausible that the stockholder would find interactions between the buyer and the seller's financial advisor during and after the bid process to be material.  Of course, these remain

---

[167] Pl.'s Ans. Br. in Opp'n. to the Sell-Side Defs.' Mots. to Dismiss, D.I. 218 ("Pl. Sell-Side Br."), at 55.

[168] *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 863 (Del. 2015).

inferences, and the exacting standard for aiding-and-abetting liability remains for trial.  J.P. Morgan's Motion to Dismiss is denied.

*B. Cravath's Motion to Dismiss is Granted*

Cravath served the Board as its outside legal advisor in the transaction. Cravath has moved to dismiss the Plaintiff's aiding and abetting claim under Chancery Court Rule 12(b)(6) for failure to state a claim.  As noted, I previously dismissed fiduciary claims against the Board based on the Plaintiff's theory of a disloyal sham transaction.[169]  I also dismissed claims alleging that the Board, Anicetti, and Duggan *intentionally* crafted a misleading 14D-9 disclosure.[170]  I allowed claims to proceed against the non-directors based on well-pled duty of care violations regarding the same disclosures.[171]  Here, I evaluate the Plaintiff's allegation that Cravath aided and abetted the duty of care violations I found reasonably conceivable regarding the negligently drafted 14D-9.

The crux of this claim is Cravath's scienter.  As noted, this prong of the aiding and abetting claim requires adequately pleading actions in bad faith through which the aider knowingly advanced the breach.[172]  This requirement provides advisors

---

[169] *Morrison v. Berry*, 2019 WL 7369431, at *13–18 (Del. Ch. Dec. 31, 2019).

[170] *Id.* at *18–20, 24, 27.

[171] *Id.* at * 25, 27.

[172] *RBC Capital Mkts.*, 129 A.3d at 861–62 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2011) (citations omitted)).

31

such as Cravath with "effective immunity from due-care liability."[173] To aid and abet, an advisor must act knowingly. Thus, in light of my dismissal of the loyalty claims against the Directors, the Plaintiff is reduced to the difficult argument that Cravath *intentionally and knowingly* caused the Board to *carelessly* draft and release a 14D-9 with material facts omitted. The Plaintiff's initial theory was that Cravath knowingly aided the Directors' disloyal cover-up of a sham transaction—those allegations have been dismissed. In order to now plead scienter on the part of the lawyers in this matter, the Plaintiff advances a modified motive: Cravath intentionally engineered a misleading 14D-9 to hide "what may have been bad lawyering" on its part to evade potential objections from stockholders and collect its transaction fee.[174] These allegations I find fanciful in light of the law of the case that the Directors did not breach the duty of loyalty. The nonconclusory allegations supporting such a claim fall short of well-pled allegations of scienter. The Plaintiff points to Cravath's fee—$5.5 million—payable only if the transaction closed, as well as the fact that Cravath "devoted significant effort to determining the content of the 14D-9."[175] A contingent fee and hard work on the proxy are unremarkable. Such conditions apply to virtually any outside counsel in a mergers and acquisitions

---

[173] *Singh v. Attenborough*, 137 A.3d 151, 152 (Del. 2016).

[174] Pl.'s Supplemental Br., at 14–16.

[175] *Id.* at 14–15.

scenario. I note that allowing an inference of scienter to stand in such a situation, in addition to being unreasonable, would work much mischief in the ability of a board to have confidential and competent advice from legal advisors. I have found only breaches of the duty of care claims reasonably conceivable against any sell-side fiduciary Defendant; merely pointing to a fee contingent on closing cannot support a claim for intentional bad-faith aiding and abetting on the part of the lawyers.

*C. Apollo's Motion to Dismiss is Granted*

Apollo has moved to dismiss the Plaintiff's aiding and abetting claim under Chancery Court Rule 12(b)(6) for failure to state a claim. As a buyer, Apollo had the right to work in its own interests to maximize its value.[176] At the same time, "a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board."[177] The Plaintiff alleges that Apollo aided both Ray Berry's breaches of his duty of loyalty and the Board's disclosure-related breaches. I find that the Plaintiff does not state a claim against Apollo.

---

[176] *See In re Comverge, Inc.*, 2014 WL 6686570, at *19 (Del. Ch. Nov. 25, 2014); *Morgan v. Cash*, 2010 WL 2803746, at *7 (Del. Ch. July 16, 2010); *see also In re Rouse Props., Inc.*, 2018 WL 1226015, at *25 (Del. Ch. Mar. 9, 2018) (noting that a buyer is "entitled to negotiate the terms of the Merger with only its interests in mind" and is "under no duty or obligation to negotiate terms that benefited [the target] or otherwise facilitate a superior transaction. . ." ).

[177] *RBC Capital Mkts.*, 129 A.3d at 862 (citing *Malpiede*, 780 A.2d at 1097 (citations omitted)); *see also Gilbert v. El Paso Co.*, 490 A.2d 1050, 1058 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990) ("[A]lthough an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders.") (internal citations omitted).

The Plaintiff argues that Apollo aided Ray Berry in his breach of his duty of loyalty. In the December 31, 2019 Opinion, I found that Ray Berry used "silence, falsehoods, and misinformation" about his relationship with Apollo in a way that conceivably harmed the Company.[178] The Plaintiff does not adequately allege that Apollo participated in this breach. There is no allegation that Apollo knew Ray Berry withheld from the Board the fact that Apollo had approached him. Instead, Apollo informed the Board no less than *five times* that it had partnered with the Berrys.[179] At every juncture—when it submitted its offer, followed up on its offer, withdrew its offer, and renewed its offer—it reminded the Board that it was acting together with the Berrys.[180] Even after Fresh Market wrote to Apollo stating that it had confirmed with Ray Berry that he had no exclusive relationship with Apollo, Apollo continued to state that its offers were "together with Ray and Brett Berry."[181] As I found, "by the time the Board initiated the sale, it had an accurate picture of the

[178] *Morrison v. Berry*, 2019 WL 7369431, at *22 (Del. Ch. Dec. 31, 2019).

[179] SAC, ¶¶ 80 (Apollo stating in initial proposal, "Apollo and the Berrys will be working together in an exclusive partnership as it relates to a transaction with the Fresh Market."), 92 (Apollo stating in follow-up letter that its proposal was "together with Ray and Brett Berry" and later in the same follow-up letter that the proposal was "together with the Berry family rollover"), 101 (Apollo stating in letter withdrawing its proposal that the proposal was "together with Ray and Brett Berry"), 102 (Apollo stating in a letter re-submitting the proposal that the re-submitted proposal was "together with Ray and Brett Berry").

[180] *See* footnote 179, *supra*.

[181] SAC, ¶¶ 100 (Director Noll's October 20, 2015 letter to Apollo stating that Ray Berry had confirmed that he had no exclusive relationship with Apollo), 102 (Apollo's November 25, 2015 proposal stating it was made "together with Ray and Brett Berry").

34

landscape. The Board knew that Berry and Apollo had an agreement for an equity rollover should Apollo succeed in its bid."[182] I cannot reasonably infer that Apollo knowingly advocated or assisted Ray Berry's deceptive communications with the Board.

This finding has implications for the alleged violations of the confidentiality agreement, as well. Even if Apollo's cryptic communication with Ray Berry in January 2016—of the "looking forward to working with you" variety—violated its no-contact agreement with Fresh Market, it was to re-affirm an understanding about which the Board was already aware. Ray Berry had revealed to the Board his agreement with Apollo to participate in an equity rollover should its bid succeed; Apollo's confirmation of such a plan could not assist Ray Berry's breach of keeping the Board in the dark.

The Plaintiff also asserts that Apollo aided and abetted the Board's breach of its obligations to ensure a reasonable sales process, a breach that I have found the Plaintiff sufficiently alleged was aided-and-abetted by J.P. Morgan. Apollo, the Plaintiff alleges, reached out to its contact at J.P. Morgan, Christian Oberle, and through him received updates and exerted influence over the bidding and bid selection process.[183] The Plaintiff argues that because of this, the Directors failed in

---

[182] *Morrison*, 2019 WL 7369431, at *15.

[183] SAC, ¶¶ 130–46.

their duty "by not limiting [J.P. Morgan's] contacts with Apollo," contending that "Apollo's back-channel efforts corrupted the work of [J.P. Morgan]."[184] The Plaintiff does not allege that Apollo knew its contact with J.P. Morgan through Oberle went undisclosed. She does not allege that Apollo knew anything about J.P. Morgan's misleading conflicts disclosure. Therefore, the Plaintiff does not plead any facts suggesting that Apollo *knew* the Board was breaching its duties and caused or attempted to exploit this breach by misleading the Board regarding its contact with J.P. Morgan. I find, on the facts pled, I cannot reasonably infer scienter. Without such an allegation, the Plaintiff has failed to state a claim that Apollo knowingly participated in such a breach by the Board.

Finally, the Plaintiff alleges that Apollo's disclosures aided and abetted disclosure-related fiduciary breaches. The allegations that Apollo participated in the drafting of the 14D-9 are conclusory. The Plaintiff alleges that "Apollo reviewed and knowingly participated in crafting the false and misleading 14D-9," and later, that Apollo "had and exercised the contractual right to review and comment" on the 14D-9."[185] The Plaintiff does not allege any further facts to support the conclusion that Apollo participated in the drafting or that, if it did, it did so with the intent to mislead.

---

[184] Pl.'s Supplemental Br., at 11–12.
[185] SAC, ¶¶ 199, 225.

Similarly, the Plaintiff's allegations regarding the Schedule TO that Apollo filed do not state a claim for aiding and abetting. The Plaintiff expressly alleges that Ray Berry "absented himself from the tender offer disclosure process, so that his lies . . . would be repeated in the 14D-9, and . . . would not be disclosed in either the Schedule TO or the 14D-9."[186] If so, this fails to imply aiding and abetting by Apollo in any disclosure-related breach. The Plaintiff then alleges that Apollo aided the Board's disclosure-related breaches because Apollo "conspired with conflicted advisors to file a false and misleading *Schedule TO* that was designed to harmonize with a false and misleading Schedule 14D-9."[187] Such a theory does not comport with the Supreme Court's finding in the appeal of this matter that "tension between the 14D-9 and Schedule TO puts stockholders in the untenable position of determining which one is accurate," as well as the finding that the Schedule TO in fact disclosed "an impression of an agreement" between Apollo and the Berrys, contradicting the 14D-9.[188] Allegations that Apollo intentionally conspired to harmonize inconsistent documents are not reasonably conceivable.

---

[186] *Id.* ¶ 217.

[187] *Id.* ¶ 225 (emphasis added).

[188] *Morrison v. Berry*, 191 A.3d 268, 278–79, 285 n.80 (Del. 2018).

*D. Brett Berry's Motion to Dismiss is Granted*

Brett Berry has moved to dismiss the Plaintiff's claim under Chancery Court Rule 12(b)(2) for lack of personal jurisdiction, or, in the alternative, failure to state a claim under Chancery Court Rule 12(b)(6). I find that this Court lacks jurisdiction over Brett Berry, and so I grant his motion under Rule 12(b)(2). When faced with a motion to dismiss pursuant to Rule 12(b)(2), "the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[189] In considering a 12(b)(2) motion, the court employs a two-step analysis: "the court must first determine that service of process is authorized by statute and then must determine that the exercise of jurisdiction over the nonresident defendant comports with traditional due process notions of fair play and substantial justice."[190] When ruling on a 12(b)(2) motion the court may consider the pleadings, affidavits, and any discovery of record—where no evidentiary hearing has been held, "the plaintiff[] need only make a prima facie showing of personal jurisdiction and the record is construed in the light most favorable to the plaintiff."[191]

---

[189] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) (citing *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318 (Del. Ch. 2003)).

[190] *Id.* (citing *Amaysing Techs. Corp. v. CyberAir Commc'ns., Inc.*, 2005 WL 578972, at *3 (Del. Ch. Mar. 3, 2005)).

[191] *Id.* (internal citations and quotation marks omitted).

38

Brett Berry was a director at Fresh Market from 1985 until March 19, 2014.[192] He served as the Company's CEO from 2007 to 2009, and as Vice Chairman of the Board from 2009 to 2014.[193] His directorial and managerial relationship with Fresh Market ended prior to any of the events at issue here, however. He is, therefore, not subject to the jurisdiction of the Court based on statutory consent. The Plaintiff instead argues solely for a conspiracy theory of personal jurisdiction, "based on the legal principle that one conspirator's acts are attributable to the other conspirators."[194] Under this theory, she asserts that Brett Berry participated in a conspiracy with Ray Berry and Apollo to take the Company private on the cheap.

Delaware adopted the conspiracy theory of personal jurisdiction in *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*[195] Showing personal jurisdiction through conspiracy requires a plaintiff to make a *prima facie* showing of the following elements:

> (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the form state; and (5) the act

---

[192] Opening Br. of the Berry Defs. in Support of Their Mots. to Dismiss Pl.'s Sec. Am. Compl., D.I. 192, Ex. B, Aff. of Brett Berry ("Berry Aff."), ¶ 13.

[193] SAC, ¶ 27.

[194] *Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *12 (Del. Ch. Feb. 11, 2015) (quoting *Matthew v. Flaakt Woods Grp. SA*, 56 A.3d 1023, 1027 (Del. 2012)).

[195] 449 A.2d 210 (Del. 1982).

in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[196]

As developed in our case law, "the five elements of the *Istituto Bancario* test functionally encompass both prongs of the jurisdictional test. The first three *Istituto Bancario* elements address the statutory prong of the test. The fourth and fifth *Istituto Bancario* elements address the constitutional prong of the test."[197] While a valid path to jurisdiction, the conspiracy theory of personal jurisdiction is "very narrowly construed" to prevent plaintiffs from "circumvent[ing] the minimum contacts requirement."[198]

"The first and second *Istituto Bancario* elements ask whether a conspiracy existed and whether the defendant was a member of the conspiracy."[199] The conspiracy need not literally be "to defraud" the plaintiff, though that is the language used; "in cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law."[200] Thus, the first question is whether Brett Berry participated in a conspiracy with either Ray

---

[196] *Id.* at 225.

[197] *Virtus Capital*, 2015 WL 580553, at *12.

[198] *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 976 (Del. Ch. 2000) (noting conspiracy jurisdiction is "very narrowly construed"); *Computer People, Inc. v. Best Int'l Grp., Inc.*, 1999 WL 288119, at *6 (Del. Ch. 1999) (noting that conspiracy jurisdiction should not be used to "circumvent" minimum contacts).

[199] *Virtus Capital*, 2015 WL 580553, at *13.

[200] *Id.* (quoting *Allied Capital Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch.2006)).

Berry or Apollo. That entails examining whether the Plaintiff has stated a viable claim for a breach of fiduciary duty and Brett Berry's aiding and abetting that breach, which would imply the knowing participation in wrongdoing necessary to conspiracy jurisdiction.

In my December 31, 2019 Opinion, I denied Ray Berry's Motion to Dismiss, so the Plaintiff has stated a viable breach of fiduciary duty claim. Earlier in this Opinion, I found that the Plaintiff has not stated a viable claim that Apollo aided and abetted Ray Berry's breach of fiduciary duty. I find that the allegations in the SAC against Brett Berry are weaker still, and do not support a claim of aiding and abetting. Based on this, I find that the Plaintiff has not made a *prima facie* showing of a conspiracy or Brett Berry's participation in it.[201]

Essentially, the Plaintiff alleges that Brett Berry actively participated in the rollover opportunity created by his father and Apollo. Ray Berry brought his son into discussions with Apollo regarding the equity rollover, and Brett Berry discussed potential transaction structures and suggested deal summaries.[202] Along with his father, Brett Berry orally agreed with Apollo to roll over his equity in the event of an Apollo acquisition.[203] He also made efforts to engage Mike Barry in the rollover

---

[201] I note that this conclusion regarding the aiding and abetting claim would also warrant dismissal under Rule 12(b)(6).

[202] SAC, ¶¶ 68–69, 75–76.

[203] *Id.* ¶ 76.

discussions.[204]  When Apollo wrote to the Company following up on its offer and described its proposed acquisition as "together with Ray and Brett Berry," Brett Berry wrote to Apollo that the letter "hits the spot."[205]  Prior to the October 15 Board meeting, Ray Berry told Duggan that he "was not aware of any conversations that may or may not have occurred with Apollo and Brett Berry," despite Ray Berry's participation in such conversations.[206]  Then, after Apollo entered its confidentiality agreement, "Jhawar's assistant emailed him to call Brett Berry," and the Plaintiff alleges "on information and belief" that Jhawar and Brett Berry spoke about the acquisition in violation of Apollo's confidentiality agreement.[207]

From these facts, the Plaintiff argues that "[i]t is reasonably conceivable that Brett Berry operated as an intermediary with Apollo in order to create plausible deniability for his father."[208]  But such a conclusion ignores the requirement that a Plaintiff bringing an aiding and abetting claim plead scienter.[209]  To find a conspiracy through aiding and abetting, there must be *some* allegation that Brett Berry knew of

---

[204] *Id.* ¶ 81.

[205] *Id.* ¶¶ 92–93.

[206] *Id.* ¶ 86.

[207] *Id.* ¶ 124.  Brett Berry would sign a joinder to that confidentiality agreement with Apollo immediately before the transaction closed in March.  The Berry Defs.' Mots. To Dismiss Pl. Elizabeth Morrison's Verified Am. Compl., D.I. 139, Ex. B, Joinder Agreement ("Joinder Agreement").

[208] Pl.'s Supplemental Br., at 16–17.

[209] *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 861–62 (Del. 2015).

his father's fiduciary breaches and intentionally aided him in those breaches. Instead, the Plaintiff merely alleges that Brett Berry took an active part in the potential rollover transaction with Apollo. Unlike his father, who hid and downplayed the relationship with Apollo, when Apollo informed the Company that the deal was "together with Ray and Brett Berry," Brett Berry sent Apollo an affirmative response. There are no allegations that Brett Berry knew of his father's misinformation to the Board, or that he tried in any way to exploit his father's fiduciary breaches. The fact that the Plaintiff believes Brett Berry continued to speak with Apollo after its confidentiality agreement was in place cannot support a claim that he intentionally aided and abetted a fiduciary breach it is not alleged that he knew about.

Without having adequately alleged aiding and abetting against either Apollo or Brett Berry, I find that the Plaintiff fails to make a *prima facie* showing that a conspiracy existed or that Brett Berry participated in that conspiracy. As such, the first two elements of the *Istituto Bancario* test are not met, and there are insufficient grounds to exercise personal jurisdiction over Brett Berry under a conspiracy theory of personal jurisdiction.[210] I therefore grant his Motion to Dismiss under Rule 12(b)(2).

---

[210] The Plaintiff offered two acts by Brett Berry to support her contention that he could have expected to be brought into court in Delaware and thus satisfy the constitutional prong. *See* Pl.'s Answering Br. in Opp'n to the Buy-Side Defs.' Mots. to Dismiss, D.I. 217, at 52; Plaintiff's

43

## III. CONCLUSION

Based on the foregoing, J.P. Morgan's Motion to Dismiss is denied. Cravath's Motion to Dismiss is granted. Apollo's Motion to Dismiss is Granted. Brett Berry's Motion to Dismiss is granted. The parties should confer and submit an appropriate form of order consistent with this Memorandum Opinion.

---

Supplemental Br., at 17. At various points in argument and briefing, however, the Plaintiff also seemed to suggest these acts might *themselves* support personal jurisdiction. For the sake of completeness, I address them briefly. *First*, the Plaintiff contends that Brett Berry "signed a rollover agreement with a Delaware forum selection provision." Pl.'s Buy-Side Br., at 52. However, Brett Berry signed that in his capacity as trustee for a trust, not personally. Opening Br. of the Berry Defs. in Support of Their Mots. to Dismiss Pl.'s Sec. Am. Compl., D.I. 192, Ex. C., Rollover, Contribution and Exchange Agreement ("Rollover Agreement"), at 14. Because he was not a party to the Rollover Agreement, it would not form the basis for personal jurisdiction. *Second*, Brett Berry signed a Joinder Agreement to Apollo's confidentiality agreement with Fresh Market. Under that agreement, Brett Berry agreed that he "shall be directly liable to Apollo for any direct or indirect breaches of the Confidentiality Agreement." Joinder Agreement, at 1. The Joinder Agreement has a Delaware forum selection clause. *Id.* The Plaintiff, a non-party to the Joinder Agreement with no rights under it, cannot use its forum selection clause to establish personal jurisdiction. In sum, even if the Plaintiff argued these alternatives constituted independent grounds for personal jurisdiction, they would be insufficient, and I consider them only as they relate to the conspiracy theory of jurisdiction.

44